# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                          :

ELISA Q. R.[1],                   :               24-CV-01743 (RMS)
*Plaintiff,*            :
                          :

V.                           :
                          :

FRANK BISIGNANO,       :
ACTING COMMISSIONER OF SOCIAL   :
SECURITY,[2]            :
*Defendant.*           :
                          :               JULY 17, 2025
------------------------------------------------------- x

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the plaintiff's application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and supplemental security income benefits ("SSI") under Title XVI of the Act. It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[3]

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Frank Bisignano was appointed Commissioner of the Social Security Administration on May 7, 2025. As such, pursuant to Rule 25(d) of the Federal Rules of Civil procedure, Frank Bisignano should be substituted as the defendant in this matter. The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[3] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment income for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), 423(c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013). *See* 42 U.S.C. § 1382(a). "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness." *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023). *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (explaining,

The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner"). (*See* Doc. No. 20). In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings. (*Id.*). The Commissioner, in turn, has moved for an order affirming her decision. (*See* Doc No. 22).

For the following reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **GRANTED IN PART AND DENIED IN PART**, and the Commissioner's motion for an order affirming that decision is **DENIED**.

## I.    <u>PROCEDURAL HISTORY</u>

On February 1, 2022, the plaintiff filed concurrent applications for both DIB and SSI benefits claiming that she had been disabled since March 15, 2020. (*See* Doc. No. 17 (Certified Transcript of Administrative Proceedings, dated December 2, 2024 ("Tr.")) at 215-228). The plaintiff's applications were denied initially on June 21, 2022, and again upon reconsideration on November 8, 2022. (Tr. 70-77, 90-97). On July 21, 2023, Administrative Law Judge ("ALJ") Edward Sweeney held a telephonic hearing at which the plaintiff and a vocational expert testified. (Tr. 48-69). On September 29, 2023, the ALJ issued an unfavorable decision denying the plaintiff DIB and SSI benefits. (Tr. 30-43). On May 13, 2024, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 11-18).

On November 1, 2024, the plaintiff filed the Complaint in this pending action. (Doc. No. 1). On November 19, 2024, the plaintiff filed a Notice indicating that she consents to a United States Magistrate Judge's jurisdiction over this matter, including the entry of a final judgment. (Doc. No. 14). The same day, the plaintiff filed an Amended Complaint. (Doc. No. 15). The

---

in a Social Security case, that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI").

following day, this matter was transferred to the undersigned.  (Doc. No. 16).  On January 10, 2025, the plaintiff filed her Motion to Remand the Decision of the Commissioner (Doc. No. 20), along with a supporting memorandum (Doc. No. 20-2) and a Statement of Undisputed Material Facts.  (Doc. No. 20-2 at 3-5).  On February 20, 2025, the Commissioner filed his Motion to Affirm (Doc. No. 22), along with his own supporting memorandum.  (Doc. No. 22-2).  On February 24, 2025, the plaintiff filed a reply.  (Doc. No. 23).

## II.  FACTUAL BACKGROUND

The medical records demonstrate that the plaintiff suffers from the following relevant physical conditions: fibromyalgia, arthritis, depression, anxiety, diabetes, heart spasms, high blood pressure, chronic pain, and lack of mobility.  (Tr. 246 (2E at 2)).  The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' briefing.  (*See* Doc. No. 20-2 at 4-5; Doc. No. 22-1 at 6-7, 9-15).  The Court cites only the portions of the record that are necessary to explain this decision.

### A.  The Plaintiff's Hearing Testimony

On July 21, 2023, the plaintiff appeared via telephone for a hearing before the ALJ regarding this disability application.  (*See* Tr. 48-69).  At the hearing, the plaintiff was first questioned by the ALJ. The plaintiff testified that she was five feet and one inch tall and weighed approximately two hundred and one pounds.  (Tr. 55).  She lived with her fifteen-year-old daughter and was currently single.  (*Id.*).  The plaintiff's thirty-six-year-old adult daughter was also temporarily living with the plaintiff during that time.  (*Id.*).

The plaintiff began by explaining her current source of income.  The plaintiff had worked as a server at the 99 Restaurant ("99") since 2008.  (Tr. 57).  Over the years she worked at the 99, the plaintiff held various positions such as a manager, hostess, and shift supervisor, but she

primarily worked as a server. (*Id.*). The plaintiff testified that she typically worked four hours a day for three days a week, but at times, her shifts lasted about five hours a day. (Tr. 56). She was paid a minimum wage of $5.48 per hour, but made about $90 per day with gratuity, although the total amount would fluctuate. (*Id.*). The plaintiff explained that her job as a server required her to take orders, to serve drinks and entrees, and to take care of guests and their needs. (Tr. 56-57). She stated that she would typically need to carry two to three plates and a tray when serving food to guests, but she was carrying less because of pain in her shoulder and her arms. (Tr. 58).

The ALJ then asked the plaintiff what had happened since March 2020 that prevented her from working. (Tr. 59). The plaintiff explained that she was suffering throughout 2019, and she was diagnosed with fibromyalgia. (*Id.*). Then, when the COVID-19 pandemic began, she was not moving as much, and "everything just came together," including her depression and issues with her joints. (*Id.*). Although the 99 closed when the pandemic began, the plaintiff stated that she still forced herself to work four or five days a week despite her pain. (*Id.*). Her hours continued to decrease, and because she could not go anywhere during the pandemic, and work was her "only way out," she fell into a "deep depression." (*Id.*). The plaintiff admitted she initially stopped working due to the pandemic, but when her job became available again six or seven months later, she could not go back. (Tr. 59-60). She was experiencing joint pain and depression, she feared getting COVID, and wearing a mask caused her anxiety and panic attacks. (Tr. 60).

At the time of the hearing, the plaintiff testified that she remained unable to work because her knees, shoulder, left arm, legs, and neck were "really bad." (Tr. 60). She underwent physical therapy at her doctor's recommendation despite the pain, but her symptoms remained the same. (*Id.*). She explained that lifting trays of food at work was very difficult, but she was still able to lift smaller trays for drinks. (*Id.*). Further, she struggled to complete "side work" in the restaurant,

because bending down or kneeling would hurt her knees. (*Id.*). She was still able to carry trays on a typical day but required help from her coworkers and manager. (Tr. 60-61). The plaintiff confirmed that more hours would not help her because, after working a full shift, her pain was "unbearable" the next day. (Tr. 61). Moreover, she could only sleep three hours a night, and despite taking Ibuprofen and Lyrica, she would still feel horrible the next day. (*Id.*). She added that the 99 had been very understanding of her pain and that management was helping her space out her shifts so she had more time between shifts. (*Id.*).

At the end of the ALJ's questioning, the plaintiff stated she had a lot of difficulty going up and down stairs and living in her two-bedroom apartment because her knees would "lock up" and she would almost fall. (Tr. 61). She explained that it was also difficult for her to reach upwards. (*Id.*). She confirmed she did not smoke, drink alcohol, or use any drugs or medication not prescribed by a doctor. (*Id.*).

Next, the plaintiff's attorney questioned the plaintiff. The plaintiff's attorney asked the plaintiff to describe her typical day off from work after a shift the previous day. (Tr. 62). The plaintiff testified that those days were difficult because she would only sleep three hours per night from tossing and turning and trying to stay in one position. (*Id.*). She would feel pain in her back, left side, and her arms. (Tr. 63). She stated that she would try to do the household chores that she could, but if she had to do any bending or twisting, she would have to sit or lie down until she could get up again. (Tr. 62). With certain movements, the pain was excruciating causing her to limp while completing chores. (Tr. 63). She clarified that she would lie down "almost all day" because she would be in so much pain and would only move between the couch and her bed to move around a little bit. (Tr. 62-63).

The plaintiff estimated she could only lift ten to twenty pounds, depending on the object. (Tr. 63). For example, the plaintiff did not believe she could lift a bag of ice, but she could lift a small weight. (*Id.*). She believed she could stand for around a half hour to an hour before needing to change positions, and she could sit down for five to ten minutes before needing to change positions. (Tr. 63-64).

As to her mental health, the plaintiff confirmed she was not receiving any treatment for her depression or anxiety. (Tr. 64). The plaintiff testified that she would have a foggy mind and thoughts and that she was tired all the time, such that she could not move around like she had in the past. (*Id.*).

At the conclusion of the hearing, the ALJ kept the record open for two weeks for the plaintiff to submit any additional documents. (Tr. 53).

**B.    The Vocational Expert's Testimony**

Vocational expert Steven Sachs also testified at the hearing. (Tr. 65-68). The ALJ first asked Sachs to classify the plaintiff's job as a server, given that she only had one employer and her primary position throughout the relevant period was a server. (Tr. 65-66). Sachs classified the plaintiff's position as a server, a semi-skilled position performed at the light exertional level. (Tr. 66).

The ALJ then presented several hypotheticals and asked Sachs to opine on the possible substantial gainful activity assuming the person had the plaintiff's profile as discussed during the hearing. (Tr. 66). First, the ALJ asked Sachs whether an individual could perform the plaintiff's past work as a server, either as the plaintiff performed it or as generally performed, if the individual was restricted to (1) "no more than occasional climbing of ladders, ropes and scaffolds"; and (2) "occasional pushing and pulling with the bilateral upper extremities, again with a range of work

6

defined as a light." (*Id.*). Sachs opined that this individual could perform the plaintiff's past work, both as actually and generally performed. (*Id.*).

Next, the ALJ asked Sachs whether the individual could perform the plaintiff's past work as a server if the individual "were further reduced to frequent stooping, kneeling, crouching and crawling . . . ." (Tr. 66). Sachs again confirmed that the individual would be able to perform the plaintiff's past work, both as actually and generally performed. (Tr. 67).

The ALJ then asked Sachs whether an individual with all the restrictions of the two previous hypotheticals could perform the plaintiff's past work as a server if the individual were further reduced to sedentary work. (Tr. 67). Sachs opined that this individual would not be able to perform the plaintiff's past work. (*Id.*). Further, Sachs stated that the server job would not have any transferable skills that could be performed at the sedentary level. (*Id.*).

Next, the ALJ asked Sachs whether there were any jobs an individual could perform assuming the individual (1) had all the restrictions of the first two hypotheticals, and (2) required "periods of rest or absence outside of customary lunch and other breaks," if those periods totaled "10 to 15% of a typical day or week . . . ." (Tr. 67). Sachs opined there would be no jobs the individual could perform with those limitations. (*Id.*). Finally, ALJ asked whether there were any jobs an individual could perform if the individual required, on average, one to two complete days off per month in order to perform the job. (*Id.*). Sachs confirmed there would not be any jobs the individual could perform with those limitations. (*Id.*).

### C.    **Objective Medical Evidence**

In formulating the plaintiff's RFC, the ALJ cites to objective medical evidence from consultative psychological examiner Dr. Kathleen Murphy, consultative examiner Dr. Steven Weisman, and treatment records from The Hospital of Central Connecticut.

In February 2021, the plaintiff underwent an MRI for her spine which revealed cervical spondylolysis. (Tr. 852 (6F at 156)). The plaintiff participated in physical therapy to address the pain associated with her spine but reported no benefit. (*Id.*).

On April 4, 2021, the plaintiff went to the emergency room complaining of lower back pain and pain radiating down her leg after moving a couch. (Tr. 481 (2F at 62)). A physical examination revealed some lateral tenderness and spasm, and after the plaintiff improved with some medication, she was discharged the same day. (Tr. 483 (2F at 64)). Throughout the summer of 2021, the plaintiff participated in physical therapy for her neck and back pain, and she reported difficulty lifting, sleeping, bathing, and performing household chores. (Tr. 356 (1F at 51)). The plaintiff reported a flare up after lifting bags of groceries and struggled to complete her home exercise plan. (Tr. 377 (1F at 72); 384 (1F at 79)).

Throughout 2022, the plaintiff underwent additional physical therapy because she was experiencing significant pain in her left upper extremity, tingling in her fingers, and headaches. (Tr. 614 (5F at 81)). Gradually, the plaintiff reported some improvement. (Tr. 639 (5F at 106); 650 (5F at 117); 825 (6F at 129)). At a follow-up appointment for diabetes management on April 28, 2022, the plaintiff reported knee pain, for which she was prescribed Tylenol, physical therapy, and hot and cold compresses. (Tr. 674 (5F at 141)). Regarding her mental health, the plaintiff denied suicidal ideation and reported that she had a behavioral health appointment scheduled for the next day. (Tr. 667 (5F at 134)).

On May 10, 2022, the plaintiff went to the emergency room because she was experiencing chest discomfort, and reported symptoms of nausea, fatigue, brain cloudiness, and depression. (Tr. 676 (5F at 143)). A physical examination yielded normal findings, with the exception of decreased sensation to light touch on her left upper extremity. (Tr. 679-680 (5F at 146-147)). She was

discharged in stable condition the next day and advised to follow up with cardiology.  (Tr. 676 (5F at 143)).  A few days later, on May 17, 2022, the plaintiff went to the outpatient clinic at the Hospital of Central Connecticut for post-hospital discharge observation and reported numbness throughout the left side of her fact and in her fingertips, as well as blurry vision in her right eye. (Tr. 689 (5F at 156)).  She was advised to follow up in one month and treatment notes suggest considering gabapentin and an MRI for her brain.  (*Id.*).  On June 16, 2022, the plaintiff reported no benefit from physical therapy and was referred to neurosurgery to discuss steroid injections. (Tr. 852 (6F at 156)).

On September 13, 2022, the plaintiff returned to the clinic because she was experiencing joint pain.  (Tr. 1085 (8F at 219)).  Her physical examination was normal, with the exception of some tender spots.  (Tr. 1089 (8F at 223)).

On October 22, 2022, the plaintiff went to the emergency room because she slipped and fell in a bathtub and hit her chest and knees.  (Tr. 875 (8F at 9)).  A physical examination revealed normal findings, except for mild tenderness in her knees and moderate compartment osteoarthritis. (Tr. 875 (8F at 9); 886 (8F at 20)).  At a post-emergency room follow-up on November 1, 2022, the plaintiff was advised not to lift heavy items at work because she had decreased range of motion in her left arm and was still experiencing numbness and tingling in her fingers.  (Tr. 1099 (8F at 233)).

On December 1, 2022, at a routine follow-up with her cardiologist, the plaintiff continued to report chest pain as a result of her fall, in addition to shortness of breath with stairs.  (Tr. 1113 (8F at 247)).  The plaintiff was encouraged to start exercising consistently, particularly on days she was not working, and to gradually increase her exercise to a minimum of 150 minutes of

moderate aerobic exercise per week. (*Id.*). On December 30, 2022, the plaintiff was discharged from physical therapy because she stopped attending. (Tr. 1126-1127 (8F at 260-261)).

On January 24, 2023, the plaintiff underwent a laparoscopic bilateral salpingectomy and right oophorectomy to remove a cyst. (Tr. 922 (8F at 56)). Although the surgery proceeded without complications, the plaintiff awoke lethargic and unresponsive and required Narcan. (*Id.*). She was subsequently weaned off oxygen and discharged the next day in stable condition. (*Id.*).

On March 6, 2023, the plaintiff began occupational therapy to address her left shoulder pain, which continued to cause her difficulties in performing household chores and taking care of herself. (Tr. 986 (8F at 102)). On March 20, 2023, the plaintiff reported feeling depressed that her symptoms had not improved.. (Tr. 988 (8F at 122)). Progress notes from subsequent sessions indicated the plaintiff's strength slowly improved. (Tr. 1001 (8F at 135)).

In May 2023, the plaintiff went to the emergency room twice because she was experiencing chest pain, mild headache, dizziness, and shortness of breath. (Tr. 1030 (8F at 164); 1073 (8F at 207)). She reported significant fatigue in the previous two weeks and stress at work because her daughter and grandson began living with her, in addition to her fifteen-year-old daughter. (Tr. 1180 (8F at 314)). Imaging results for both visits were unremarkable, and the plaintiff was discharged with instructions to follow up with her cardiologist and primary care physician. (Tr. 1074 (8F at 208)).

### D.    <u>Medical Opinions</u>

The medical opinions relevant to this case concern state agency psychological consultants Dr. Christopher Leveille and Dr. Michelle Nitto Leveille, who completed the psychological portions of the Disability Determination Examinations at the Initial and Reconsideration stages, respectively, and consultative psychological examiner Dr. Kathleen Murphy.

### 1. State Agency Psychological Consultants

Dr. Christopher Leveille assessed the plaintiff's mental health at the initial stage on May 4, 2022. (Tr. 74-75, 81). Dr. Leveille opined that despite the plaintiff's diagnosis of persistent depressive disorder with anxious distress, the plaintiff had no mental health treatment history, and her complaints were not well established. (Tr. 81). Specifically, the plaintiff stopped working in March 2020 due to the COVID-19 pandemic at which time she was not receiving treatment. (Tr. 74). Moreover, a consultative examination affirms only her physical complaints of pain due to arthritis and fibromyalgia. (*Id.*). Dr. Leveille noted the plaintiff felt unable to work because of "constant fear and anxiety" regarding wearing a mask, but when notified that there was no longer a mask mandate, she stated she could not work because of her pain. (*Id.*). Further, the plaintiff never participated in counseling, had no history of emergency department visits or hospitalizations, cared for her daughter, managed her finances, and completed household chores. (*Id.*).

As a result, Dr. Leveille assigned mild limitations in all the four functional areas of the paragraph B criteria, including (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (Tr. 74).

Dr. Michelle Nitto Leveille evaluated the plaintiff's mental health at the reconsideration stage on September 2, 2022. (Tr. 93-94). Dr. Nitto Leveille noted the plaintiff had no prior treatment history, did not have significant symptoms, and her anxiety was largely related to her cardiac symptoms and chest pain. (Tr. 94). Further, the plaintiff had not alleged that her symptoms had worsened at the reconsideration level and sought no treatment. (*Id.*).

Consequently, Dr. Nitto Leveille assigned mild limitations only in two areas: (1) concentrating, persisting, or maintaining pace; and (2) adapting and managing oneself. (Tr. 93).

Dr. Nitto Leveille assigned no limitations in the other two areas regarding understanding, remembering, or applying information and interacting with others. (*Id.*).

### 2.  Consultative Psychological Examiner

Dr. Kathleen Murphy performed a consultative psychological examination on April 29, 2022. (Tr. 523-527).  Dr. Murphy described the plaintiff's complaints of "constant worrying," "constant sadness and a sense of doom" which began around the time of the COVID-19 pandemic. (Tr. 524).  Specifically, the plaintiff's physical pain, the pandemic, and the news all made her sad and caused her to stop attending activities. (*Id.*).  Dr. Murphy noted the plaintiff never participated in counseling although her physician recommended it, and had no psychiatric hospitalizations or suicidal, homicidal, or psychotic ideations. (*Id.*).  Instead of counseling, Dr. Murphy explained that the plaintiff talked with her sister and prayed, and recently attended church service in person for the first time since the pandemic. (Tr. 524-525).

As to the results of the mini-mental status examination, Dr. Murphy noted the plaintiff could spell the word "world" backwards and was generally alert and oriented. (Tr. 525).  However, the plaintiff's mood was "sad" and her affect was "flat." (*Id.*).  Although the plaintiff could repeat three out of three objects immediately, she could not repeat any after a five-minute delay. (*Id.*).  As to her current level of functioning, Dr. Murphy opined that the plaintiff's physical pain, anxiety, and sadness may reduce the quality of her interactions with family members and interfere with her concentration, task completion, and adaption to work situations. (Tr. 526).

## III.  <u>THE ALJ'S DECISION</u>

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Social Security Act ("SSA").

*See* 20 C.F.R. § 404.1520(a).[4]  In this case, the ALJ determined that the plaintiff met the insured status requirements under the SSA through June 30, 2025.  (Tr. 70).

At Step One, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 15, 2020.  (Tr. 33).  The ALJ noted that although the plaintiff had worked after her alleged onset date, her work activity did not rise to the level of substantial gainful activity.  (*Id.*).

At Step Two, the ALJ determined that the plaintiff had one severe impairment, cervical spondylosis, which "significantly limits the ability to perform basic work activities as required by SSR 85-28."  (Tr. 33 (citing 20 C.F.R. 404.1520(c) and 416.902(c)).  The ALJ noted many of the plaintiff's other medically determinable impairments and explained why they were not severe, including "ovarian cyst, diabetes mellitus, obesity, hypertension, hyperlipidemia, atypical chest pain of likely musculoskeletal etiology, right knee osteoarthrosis and depressive disorder."  (*Id.* (internal citation omitted)).

---

[4] An ALJ determines a claimant's disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, an ALJ must determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80.  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80.

First, the plaintiff's ovarian cyst resulted in only minimal limitations for less than twelve consecutive months.  (*Id.*).  On January 24, 2023, the plaintiff underwent a laparoscopic bilateral salpingectomy and right oophorectomy to remove the cyst, which revealed the cyst was negative for tumor markers.  (*Id*).  The plaintiff was subsequently discharged the next day in stable condition and without any indication of further complications or symptoms.  (Tr. 33-34).

Further, the ALJ considered the plaintiff's May 2022 visit to the emergency room based on her symptoms of chest and arm pain, nausea, dizziness, and a headache.  (Tr. 34).  However, the plaintiff's physical exams and cardiac workup were unremarkable, she was ambulatory, and her symptoms improved with nitroglycerin, aspirin, and morphine.  (*Id.*).  The plaintiff was discharged in stable condition with losartan, metoprolol, and a statin, and she was advised to follow up with her primary care physician.  (*Id.*).

As to her diabetes, the ALJ noted that the plaintiff's primary care physician stated the plaintiff's diabetes was generally asymptomatic and controlled with insulin, her hypertension was well-controlled, and her A1c levels had improved.  (*Id.*). She was advised to continue her lifestyle modifications and to continue taking her medication.  (*Id.*).

As to her chest pain, the plaintiff was advised to continue taking nitroglycerin and to follow up with a cardiologist.  (*Id.*).  Subsequent consultations and exams yielded normal results, and the plaintiff was advised to continue her cardiac medication regimen and to exercise regularly.  (*Id.*).

As to obesity, the ALJ found there was "no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning."  (*Id.*).

As to her knee osteoarthritis, the ALJ considered the plaintiff's October 2022 visit to the emergency room after the plaintiff slipped in a bathtub and injured her chest and knees.  (*Id.*).  However, a physical exam revealed she was neurologically intact and had a steady gait, and

14

imaging showed only "mild to moderate compartment osteoarthritis, but no acute osseous abnormality." (*Id.*). The plaintiff's cardiologist recommended regular exercise and walking, and physical exams throughout 2023 continued to show the plaintiff was neurologically intact and had no gait problems. (*Id.*).

Moreover, the ALJ evaluated the areas of mental functioning set out in the Listings for evaluating mental disorders to determine whether the plaintiff's depressive disorder was severe or non-severe. *See* 20 C.F.R. Part 404, SubPt P, App'x 1, § 12.00, *et seq*. Specifically, the ALJ considered the four broad functional areas under the "paragraph B" criteria, including understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 35). As to the first two functional areas, the ALJ found the plaintiff had no limitation because she did not need reminders to take medication or to perform personal care, she was alert and oriented with intact immediate memory, and she could shop in grocery stores once a month. (*Id.*). As to the third functional area, the LJ found the plaintiff had mild limitation because she reported needing instructions repeated due to her difficulty concentrating and "brain fog." (*Id.*). However, the ALJ also noted the plaintiff testified that her daily activities included reading and watching television, and at a consultative examination, "she was able to spell 'world' backwards and was not restless or fidgety." (*Id.*). Finally, as to the fourth functional area, the ALJ found the plaintiff had no limitation because although her anxiety impaired her sleep and her pain limited her functioning, she could perform light cleaning and prepare simple meals, and did not follow up with referrals for counseling. (*Id.*). As a result, the ALJ found the plaintiff's depressive disorder to be non-severe because it caused no more than mild limitation in any of the functional areas and that there was no more than a minimal limitation in her ability to do basic work activities. (*Id.*).

Lastly, the ALJ considered the plaintiff's fibromyalgia and concluded it was not a medically determinable impairment.   Pursuant to SSR 12-2p, fibromyalgia is medically determinable if one of two sets of three criteria are met, and the diagnosis is not inconsistent with the other medical evidence.  (Tr. 36).  The ALJ noted that there was evidence of rheumatology workups, and the plaintiff had been prescribed medication for the condition.  (Tr. 37).  However, the ALJ ultimately determined there was a lack of evidence in the record of clinical signs or symptoms from her physical exams to support the diagnosis and a lack of evidence to rule out other disorders that could account for the plaintiff's complaints of body pain.  (*Id.*).  Thus, the ALJ found fibromyalgia was not a medically determinable impairment because the diagnosis was inconsistent with SSR 12-2p.  (*Id.*).

At Step Three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (the "Listings").  (Tr. 37).  *See* 20 C.F.R. Part 404, SubPt P, App'x 1.  The ALJ evaluated the Listings regarding musculoskeletal disorders.  *See* 20 C.F.R. Part 404, SubPt P, App'x 1, § 1.00, *et seq*. The ALJ specifically considered the plaintiff's cervical spine disorder and determined that the impairment did not meet Listing 1.15.  (Tr. 37).

Next, the ALJ formulated the plaintiff's residual functional capacity ("RFC").  A plaintiff's RFC is the most that a claimant can do despite their impairments and is determined by assessing all the relevant evidence.  *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ determined the plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b), except [the plaintiff] can occasionally climb ladders, ropes, or scaffolds, and can frequently stoop, kneel, crouch, and crawl. She can occasionally push and pull with the bilateral upper extremities."  (Tr. 37).

At Step Four, the ALJ found that the plaintiff could perform her past work as a server, both as generally performed and as actually performed by the plaintiff. (Tr. 41). As such, the ALJ determined that the plaintiff had not been under a disability since the alleged onset date. (Tr. 42).

## IV.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence means more than a scintilla, or in other words, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 229 (1938)). The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal citation omitted); *see also Wagner v. Sec'y of Health & Hum. Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (when reviewing denial of DAC, district court may not make *de novo* disability determination). A district court "must 'consider the whole record,

examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

"Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*.  If there is a "reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V.    **DISCUSSION**

The plaintiff raises one argument on appeal. The plaintiff maintains that the ALJ erred as a matter of law both by not accounting for the plaintiff's mild mental limitations in concentration, persistence, and pace and by failing to explain why these limitations were not included in the RFC. (Doc. No. 20-2 at 6).  The Commissioner responds that the ALJ's decision is supported by substantial evidence because the ALJ did consider the plaintiff's mental impairment at both step two and in the RFC and that any failure to include a mild mental limitation in the RFC was harmless error.  (Doc. No. 22-1 at 5).

For the reasons below, the Court finds that remand is warranted because the ALJ committed procedural error by failing to account for the plaintiff's mild mental impairment in formulating the RFC and by failing to explain why no mental limitations were included.

### A.    Residual Functional Capacity Determination

At step two, the ALJ must determine whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities.  *See* C.F.R. § 404.1520(c).  "[A] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  *Rosario v. Apfel*, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n.2 (1987)).  It is the plaintiff's burden to provide "medical evidence which demonstrates the severity of her condition."  *Merancy v. Astrue*, No. 3:10-CV-1982 (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012).  If the ALJ finds the plaintiff has at least one severe impairment or combination of impairments, the ALJ is required to consider all impairments and symptoms when formulating the RFC, including medically determinable impairments that are not severe.  *See* 20 C.F.R. § 404.1545(a)(2); *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995) ("[T]he combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.").  The RFC determination "must be set forth with sufficient specificity to enable [the Court] to determine whether the determination is supported by substantial evidence."  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

To evaluate the severity of mental impairments, the Commissioner has promulgated additional regulations that require the ALJ to apply a "special technique."  *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008); 20 C.F.R. §§ 404.1520a(b)-(e).  The ALJ must "rate the degree of functional limitation" from a medical determinable impairment in "four broad functional areas: (1)

activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(c)(3)).

In this case, at step two, the ALJ determined the plaintiff had one severe medically determinable impairment, cervical spondylosis. (Tr. 33). The ALJ also found the plaintiff's depressive disorder was a non-severe medically determinable impairment. (Tr. 35). The ALJ then applied the "special technique" and explained that the plaintiff's depressive disorder caused mild limitation in concentrating, persisting, or maintaining pace, and no limitation in any other functioning area. (*Id.*). Thus, the ALJ concluded the plaintiff's depressive disorder was non-severe "[b]ecause the claimant's medically determinable impairment causes no more than 'mild' limitation in any of the functional areas *and* the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities . . . ." (*Id.*).

However, an ALJ's failure to consider the impact of all of a claimant's medically determinable impairments when formulating the RFC constitutes legal error and warrants remand. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order) (holding ALJ committed legal error by failing to account for plaintiff's mental limitations when determining RFC); *Wright v. Barnhart*, No. 3:05-CV-1487 (SRU)(WIG), 2006 WL 4049579, at *15 (D. Conn. Dec. 14, 2009) ("Here, once the ALJ determined that [the plaintiff's] mental impairment was not severe, he set it aside without further discussion and proceeded to evaluate [the plaintiff's] disability based on solely on her physical impairments. This was erroneous as a matter of law."); *Texidor v. Astrue*, No. 3:10-CV-701 (CSH), 2014 WL 4411637, at *18 (D. Conn. Sept. 8, 2014) (remanding where ALJ failed to account for plaintiff's episodes of decompensation, the frequency or intensity of the episodes, or "the impact these episodes would have on plaintiff's ability to perform basic work activities"); *Kimberly F. v. Comm'r of Soc. Sec.*, No. 1:22-CV-385 (DB),

2024 WL 3506971, at *5 (W.D.N.Y. July 23, 2024) ("Regardless of whether the ALJ's step-two severity determination regarding Plaintiff's anxiety impairment was supported by substantial evidence, the record does not demonstrate that the ALJ properly considered the impact of that impairment in evaluating plaintiff's RFC, as he was required to do. This error requires remand."). This failure frustrates meaningful judicial review. *See Burgos v. Astrue*, No. 3:09-CV-1216 (VLB), 2010 WL 3829108, at *3 (D. Conn. Sept. 22, 2010) ("[T]he Court is unable to determine whether the ALJ evaluated the combined effect of Plaintiff's impairments as a whole on her ability to work, or whether the ALJ instead considered only those six impairments actually identified in the decision.").

In this case, the plaintiff does not challenge the ALJ's step two determination finding the plaintiff's depressive disorder non-severe. Rather, the plaintiff argues the ALJ erred by failing to include any mental limitations in the RFC and by failing to explain his rationale for doing so. (Doc. No. 20-2 at 12). The Commissioner argues the ALJ is not required to incorporate a mild mental limitation into the RFC and that the ALJ did consider the plaintiff's mental impairments based on his discussion on the findings of the state agency psychologists. (Doc. No. 22-1 at 10).

The Court agrees with the plaintiff and finds that the ALJ erred by failing to adequately address or account for any functional limitations associated with the plaintiff's depressive disorder in the RFC. In his decision, after identifying the limitations in the paragraph B criteria, the ALJ stated at step two that "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B mental function analysis." (Tr. 36). He also stated, without specificity, that "[t]he

undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity."  (Tr. 35).

However, nothing in the ALJ's decision suggests that he performed this "more detailed assessment" at step four or that he accounted for the plaintiff's mild mental limitations caused by her mental impairment, depressive disorder.  The ALJ conducted a thorough analysis regarding the plaintiff's physical limitations when formulating the RFC.  For example, the ALJ specifically considered the plaintiff's subjective complaints, including "chronic pain from arthritis and fibromyalgia," "limited mobility in her neck, back, shoulders, arms, and knees," "difficulty lifting more than 10-20 pounds, lifting her arms, climbing stairs, sitting or standing for prolonged periods, kneeling, and squatting," "locking-type sensations in her back, arms, and knees, causing a limp when getting up," and "constant fatigue, despite physical therapy."  (Tr. 38).  The ALJ further considered the plaintiff's brief courses of physical therapy for her low back and neck pain, and the absence of any long-term pain medications, pain management, or recommendations for surgery. (Tr. 39).  Moreover, the ALJ thoroughly discussed the plaintiff's medical history for her physical symptoms, including her 2021 MRI of her spine and subsequent visit to the emergency room, her April 2022 consultative examinations, her October 2022 slip and fall which resulted in another visit to the emergency room, her physical exams from her January 2023 cyst removal, and her May 2023 emergency room visit and subsequent occupational therapy and MRI.  (Tr. 39-40).

However, the ALJ failed to perform any analysis regarding the plaintiff's depressive disorder and the impact, if any, of the plaintiff's depressive disorder on her ability to work.  There is no indication the ALJ considered the plaintiff's complaints of a foggy mind, or that she was tired all the time because of her depression and could not move around like she had in the past.  (Tr. 64). In explaining the basis for the RFC, the ALJ briefly mentioned the "physical and mental

abilities" required for the plaintiff to perform some of her daily activities and her work as a part-time server. (Tr. 39). But notably, the ALJ did not identify the plaintiff's depressive disorder or explain the impact of the mild mental limitations in concentrating, persisting, or maintaining pace he identified at step two. (Tr. 35, 39). Indeed, at step two, the ALJ noted the plaintiff reported needing instructions repeated due to difficulty concentrating and "brain fog." (Tr. 35). However, the ALJ did not reference these limitations after his step two analysis at all, nor is there any evidence in his decision that he considered the impact these limitations would have on the plaintiff's ability to perform basic work activities.

The Commissioner avers that the ALJ did consider the plaintiff's mental impairments because the ALJ reasonably agreed with the state agency psychologists' findings. (Doc. No. 22-1 at 10). Consequently, the Commissioner provides extensive citations to the plaintiff's treatment records and examinations that show her mental health treatment was "both limited and conservative." (*Id.* at 10-11). This argument fails in two ways. Not only are the ALJ's findings regarding the persuasiveness of the medical opinions not at issue, but the Court also may not "create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." *Petersen v. Astrue*, 2 F. Supp. 3d 223, 234 (N.D.N.Y. 2012) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action." (internal quotations omitted)). Because the ALJ did not include any of this reasoning regarding the plaintiff's mental impairment in his RFC decision at the agency level, the Court may not infer these bases for his reasoning now.

The ALJ's brief reference to the state agency psychologists and the opinion of Dr. Kathleen Murphy does not satisfy his obligation to address the impact of the plaintiff's mental impairments

on the RFC.  The state agency psychological consultants opined that the plaintiff's depressive disorder was non-severe and resulted in mild or no limitations in the paragraph B criteria.  (Tr. 74, 94).  In one sentence, and with zero citations to the record, the ALJ found the state agency psychological consultants' findings persuasive "because they are consistent with and supported by the minimal and generally unremarkable mental health evidence of record."  (Tr. 40).  However, both Dr. Christopher Leveille and Dr. Michelle Nitto Leveille assigned mild limitations in some or all of the four functional areas, and the ALJ did not explain whether or how those limitations affect the RFC.

Similarly, consultative psychological examiner Dr. Kathleen Murphy opined that the plaintiff's anxiety, physical pain, and sadness may interfere with her interactions with family members, concentration and task completion, and her ability to tolerate stress, make decisions, maintain attendance, be reliable and dependent, and interact with supervisors in the workplace." (Tr. 41 (quoting Tr. 526 (3F at 4))).  The ALJ found Dr. Murphy's opinion unpersuasive and stated only that these limitations "are not clearly quantified in vocationally relevant terms and are somewhat speculative and imprecise, and are based on a one-time examination. Moreover, the suggestion of more than minimal mental limitations is inconsistent with the lack of psychiatric complaints or abnormalities noted in the treatment record."  The ALJ thus concluded, "an assessment of some functional limitations is appropriate" but that "the medical evidence of record supports a finding that the claimant remains able to sustain the physical demands of work at the light exertional level with the postural, pushing, and pulling limitations above."  (Tr. 41).

Again, the ALJ's analysis is insufficient because he failed to engage with the record and did not conduct any analysis regarding the plaintiff's mental impairment and its impact on her ability to work.  It is not clear whether or how the mild mental limitations in concentrating,

persisting, or maintaining pace affect the RFC because the ALJ did not address them.  Although the ALJ stated the "residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis," (Tr 36), "such lip service is insufficient to satisfy the legal requirement that the RFC assessment . . . include a narrative discussion describing how the evidence supports each conclusion, citing medical facts e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *MacDonald v. Comm'r of Soc. Sec.*, No. 17-CV-921, 2019 WL 3067275 (W.D.N.Y. July 11, 2019) (internal quotations omitted).  To the extent the ALJ found the plaintiff had no mental limitations, the ALJ failed to explain his rationale for omitting any mental limitations from the RFC.  The Court cannot know from the ALJ's decision whether he considered her depressive disorder when he formulated the RFC because the RFC includes no mental restrictions or limitations whatsoever.

This error is not harmless because, as the plaintiff points out, the ALJ's step four finding depends on the plaintiff's ability to return to her past semi-skilled work as a server.  (Doc. No. 23 at 4).  If the plaintiff's limitations in concentrating, persisting, or maintaining pace, alone or in combination with her other impairments, limit her to only unskilled work, then the ALJ's step four finding that the plaintiff could perform her past semi-skilled work as a server would indeed be unsupported.

On remand, the ALJ should consider all the plaintiff's impairments in the RFC determination.  Specifically, the ALJ should address whether or to what extent the mild mental limitations caused by the plaintiff's depressive disorder affect her ability to work as a server, and he must explain his reasoning.  As the plaintiff correctly notes, "[t]he ALJ may find that [the plaintiff's] mental impairments are inconsequential and thus, reject the need to incorporate mental

limitations into the RFC—but he must explain his reasoning for doing so." *Laura Anne H. v. Saul*, 6:20-CV-397 (TWD), 2021 WL 4440345 (N.D.N.Y. Sept. 28, 2021).

     **B.**    **<u>Remand for Further Administrative Proceedings Is Appropriate</u>**

     While the plaintiff seeks an order reversing and remanding to the Commissioner for the payment of benefits, (Doc. No. 20 at 1), the Court declines to do so. "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). "Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision." *Salisbury v. Colvin*, No. 13-CV-2805 (VEC) (MHD), 2015 WL 5458816, at *27 (S.D.N.Y. Sept. 1, 2015), (citing *Pratts v. Charter*, 94 F.3d 34, 39 (2d Cir. 1996)), *report and recommendation adopted*, No. 13-CV-2805 (VEC) (MHD), 2015 WL 5566275 (S.D.N.Y. Sept. 21, 2015).

     The Court has reviewed the record and finds that the plaintiff has not provided persuasive proof that she was disabled. Because the Court cannot know from the ALJ's decision how the plaintiff's mental limitations affect her RFC, if at all, further proceedings are required to evaluate the plaintiff's ability to work in light of her depressive disorder. The impact of the plaintiff's depressive disorder on her RFC may ultimately impact her ability to perform her semi-skilled past work as a server. As such, "[r]emand for calculation of benefits would therefore be inappropriate." *Id*. Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this Ruling.

**VI.**    **<u>CONCLUSION</u>**

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 20) is **GRANTED IN PART AND DENIED IN PART** for further consideration of the effect of the plaintiff's mental impairment on the RFC.  The Commissioner's motion to affirm that decision (Doc. No. 22) is **DENIED**.  The Clerk shall enter judgment, effect remand to the Commissioner, and close the case. The Clerk is further instructed that, if any party subsequently appeals to this Court the decision made after remand, that Social Security appeal shall be assigned to me, as the Magistrate Judge who issued the ruling that remanded the case.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

It is so ordered this 17th day of July, at New Haven, Connecticut.

___/s Robert M. Spector_____
Robert M. Spector,
United States Magistrate Judge